IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RAAB FAMILY PARTNERSHIP, et al., | : | HON. JEROME B. SIMANDLE |
| | : | Civil No. 08-5050 (JBS) |
| Plaintiffs, | : | |
| v. | : | **OPINION** |
| BOROUGH OF MAGNOLIA, | : | |
| Defendant. | : | |

APPEARANCES:

F. Michael Daily, Jr., Esq.
Sentry Office Plaza
216 Haddon Avenue
Suite 100
Westmont, NJ 08108
     Attorney for Plaintiffs Raab Family Partnership, R&R Real
     Estate, and Marvin Raab

Salvatore J. Siciliano, Esq.
SICILIANO & ASSOCIATES, LLC
16 South Haddon Avenue
P.O. Box 25
Haddonfield, NJ 08033
     Attorney for Defendant Borough of Magnolia

**SIMANDLE**, District Judge:

I.   **INTRODUCTION**

     This case arises out of a dispute between Plaintiffs – two

companies that own and lease rental apartments in two complexes,

as well as an individual affiliated with the companies – and the

Borough of Magnolia, where the apartment complexes are located.

In the claims at issue in Plaintiffs' motion, Plaintiffs seek (1)

to preliminarily enjoin the Borough from enforcing its property

rental ordinances in a manner that infringes upon Plaintiffs'
rights under the Fair Housing Act, 42 U.S.C. 3601, et seq.
("FHA"), and (2) partial summary judgment granting a declaratory
determination by the Court that the Borough's ordinance
pertaining to the issuance of certificates of occupancy is
facially unconstitutional.  Defendant has opposed Plaintiffs'
motion through Affidavits and a series of documents attached
thereto, but, as is explained, infra, has not submitted a brief
explaining why Plaintiffs are not entitled to the relief they
seek.

The Court heard oral argument on Plaintiffs' motion at a
hearing convened on February 11, 2009.  For the reasons explained
below, the Court will enter a limited preliminary injunctive
order, described in detail herein, enjoining Defendant from
further engaging in conduct which the Court finds violates
Plaintiffs' rights under the FHA, and will grant Plaintiffs'
motion for partial summary judgment, finding the ordinance
pertaining to the issuance of certificates of occupancy facially
unconstitutional.

**II.   BACKGROUND**

A.   **Facts**

The facts as they appear from the parties' submissions are

as follows.[1]  Plaintiff Marvin Raab is a partner at Raab Family

Partnership "(RFP"), a company that owns the Forest Gate

apartment complex in the Borough of Magnolia.  (Raab Aff. ¶¶ 1-

5.)  RFP owns a seventy-five percent interest in R&R Real Estate

("R&R"), a company that owns the Amber Court apartment complex,

also located in Magnolia.  (Id.)  Plaintiffs have owned the

Forest Gate and Amber Court complexes since 1996 and 1999,

respectively.  (Id. at ¶¶ 7-8.)

    In 2007, the Borough enacted Ordinance 2007:11A, entitled

"An Ordinance Creating 'Landlord Responsibilities.'"  (Daily Aff.

Ex. A at 1.)  Ordinance 2007:11A contains among its provisions

two sections which Plaintiffs find to be harsh and potentially

unlawful.  First, section 5.36.030 makes "[a]ny landlord and/or

owner of a leased property within the borough . . . responsible

for any activities, actions or events and the conduct of any

person and/or animal which occurs in, on or about said premises

or property[, including] any disorderly conduct, nuisance and any

---

[1]   As the Court explains, infra, Defendant's opposition to
Plaintiffs' motion consists of two short affidavits and a series
of documents attached thereto.  Because Defendant has failed to
submit a brief in opposition to Plaintiffs' motion (or a counter-
statement of material facts pursuant to Local Civil Rule 56.1) in
spite of the Court's latitude in affording it extensions for such
filings, (Docket Item 18), the facts reviewed herein are drawn
primarily from Plaintiffs' submissions.  See Collins v. Secretary
of Veterans Affairs, 257 F. Supp. 2d 812, 815 (E.D. Pa. 2003)
(noting difficulty of construing a "one-inch thick stack of
papers . . . seemingly . . . related to Plaintiff's [claims]"
because non-movant "did not submit a brief to explain what the
documents submitted were specifically intended to prove").

other behavior or conduct which is a violation of any state
statute or of any of the provisions of the code of the borough."
(Id. at 3.)  Additionally, Ordinance 2007:11A created a licensing
requirement for rental properties, charging $200 per rental unit
per year, but, "if [the] landlord has been convicted of any
violation of [the] borough code[,] the annual fee of said unit
and all units if multiple units will be $500.00 each unit for
[the] following year."  (Id. at 4.)

Certain Magnolia landlords, including Plaintiffs, balked at
the new ordinance, claiming that "the base fee of $200 was
exorbitant as compared with similar fees charged by other
municipalities," (Plotkin Aff. ¶ 12), that the fee increase per
unit for any landlord's violation of any provision of the Borough
Code was unreasonably punitive, and that the ordinance
unreasonably imposed liability on landlords for the conduct of
"any person and/or animal" on their premises.  (Daily Aff. Ex. A
at 3.)  In response to the landlords' concerns, the Borough
convened a meeting at Borough Hall on February 8, 2008.  (Plotkin
Aff. ¶ 17.)  At the meeting, the Mayor of Magnolia, Betty Ann
Cowling-Carson, defended the ordinance, stating that the
increased fees were necessary to hire rental property inspectors
and, apparently with regard to the landlord liability provisions
in the ordinance, that rental tenants were having arguments that
required the police to respond to complaints at apartment

4

complexes.  (Id. at ¶ 21.)  According to a witness who was present at the Borough Hall meeting, Mayor Cowling-Carson then stated that the Borough's primary concern with regard to rental complexes was that the Borough did not want "the trash from Lindenwold moving to Magnolia."  (Id. at ¶ 22.)  Plaintiffs believe that the Mayor's remarks indicated that the ordinance and its subsequent enforcement policies targeted Plaintiffs on account of the race of their current and prospective tenants. (Id. at ¶¶ 30-31.)

In the wake of the Mayor's comments at the Borough Hall meeting, Plaintiffs allege that they have been subjected to overzealous enforcement of the Borough's rental ordinances.  This alleged over-enforcement appears to consist of the Borough having issued citations of Plaintiffs' properties that fall into two categories: (1) citations for violating the Borough's ordinance requiring landlords to possess current certificates of occupancy for all rented properties, and (2) citations of properties for maintenance problems which, according to Plaintiffs, failed to put Plaintiffs on notice of the specific nature of the maintenance violations and the basis for the citations.  As to the first category of citations, in early April 2008 – approximately two months after the Borough Hall meeting – the Borough issued fifty-three citations to Plaintiffs for having rented units without having first obtained certificates of

occupancy.² (Id. at ¶ 38.)  When Plaintiffs informed the Borough
that they indeed possessed certificates of occupancy for all of
the cited properties, and requested that the Borough reexamine
its records, Plaintiffs were informed that the Borough "didn't
have the time to check them and [that] it was basically
[Plaintiffs'] task to disprove the charges."  (Id. at ¶ 42.)
Over the next four months, through numerous contacts between
Plaintiffs' counsel and the Borough, Plaintiffs "obtained and
submitted to the Borough the information that proved that in not
one instance had [Plaintiffs] violated Chapter 112."  (Id. at ¶
45.)

        In addition to these allegedly baseless citations for
violating the Borough's certificate of occupancy ordinance,
Plaintiffs allege that they have been issued citations for
maintenance problems, but that the Borough has not been
forthcoming as to the nature of the specific violations (or at
least has not been forthcoming on a timely basis).  (Plotkin Aff.
¶¶ 27-29.)  On April 1, 2008, Mr. Raab received from Magnolia
Police Code Enforcement Patrolman Kevin Lally a notice
identifying various specific maintenance and building code

---

        ² Chapter 112 of the Borough Code makes it unlawful to rent
a unit "that has had a change in ownership or a change in
occupancy . . . until a certificate allowing the new occupancy
and/or use shall have been applied for by the owner or the
owner's agent and such certificate issued by the Building
Inspector or Housing Inspector of the Borough of Magnolia."
(Raab Aff. Ex. A at 1.)

violations at Plaintiffs' properties.  (Raab Aff. Ex. C at 1.)
The notice informed Plaintiffs that the identified violations
needed to be remedied within thirty days "to avoid citations from
the Borough," and stated that following the thirty-day period,
the Borough would reinspect the property.  (Id.)  This notice was
followed by an April 16, 2008 letter indicating that "due to the
extreme nature of the violations," new certificates of occupancy
for Plaintiffs' apartment complexes would not issue until the
violations were remedied.  (Raab Aff. Ex. D.)

　　　Plaintiffs allege that they addressed each of the identified
violations and met with the Manager of Borough Services, who
identified additional cosmetic matters that he wished for
Plaintiffs to address.  (Raab Aff. ¶¶ 39-40.)  Plaintiffs
believed that these cosmetic matters were a "wish list" and that
correcting these items was voluntary.  (Id. at ¶ 41.)  On June
11, 2008, the Borough wrote to Plaintiffs indicating that no
certificates of occupancy would be issued "until further
maintenance issues are corrected."  (Raab Aff. Ex. E.)  A series
of letters between Plaintiffs' counsel and the Borough ensued, in
which Plaintiffs asserted that the remaining "maintenance issues"
were merely "cosmetic or aesthetic in nature and pose[d] no
violation of Borough Ordinances or Building Codes," (Raab Aff.
Ex. F at 1), and the Borough insisted that such matters be
corrected before additional certificates of occupancy would be

7

issued.  (Raab Aff. Ex. G at 1.)  According to Plaintiffs, it was
not until July 24, 2008 that they received specific details
regarding the cited code infractions.  (Raab Aff. Exs. I and J.)
Plaintiffs addressed the cited repairs and by September 2008 the
Borough resumed issuing certificates of occupancy to Plaintiffs.
(Raab Aff. ¶ 55.)  Plaintiffs allege that the Borough's allegedly
unjustified withholding of certificates of occupancy resulted in
lost rental income in the amount of $76,030.00.  (Id. at ¶ 56.)

   **B.   Procedural History**

   Plaintiffs commenced this action on October 13, 2008,
alleging, inter alia, that the Borough's ordinance governing the
issuance of certificates of occupancy is facially
unconstitutional (Count I) and that the Borough's enforcement of
its allegedly discriminatory rental ordinances violated
Plaintiffs' rights under the FHA (Count VII).  On December 3,
2008, Plaintiffs filed a motion seeking (1) to enjoin the Borough
from enforcing its property rental ordinances in a manner that
infringes on Plaintiffs' rights under the FHA, and (2) a
declaratory determination by the Court that the Borough's
ordinance pertaining to the issuance of certificates of occupancy
is unconstitutional on its face [Docket Item 7].  After Defendant
failed to oppose Plaintiffs' motion, the Court convened a
telephone conference and, with Plaintiffs' consent, entered an
Order [Docket Item 12] scheduling a hearing on Plaintiffs' motion

and affording Defendant an opportunity to oppose the motion.

On January 26, 2009, Defendant filed its opposition to Plaintiffs' motion, which consists entirely of two short affidavits and a collection of attached documents [Docket Items 14-16], the significance of which is not explained in a legal brief.  Defendant likewise failed to "file a statement that no brief is necessary and the reasons therefor," as Local Civil Rule 7.1(d)(4) requires of parties opposing a motion but not submitting an opposition brief.  As the Court explained in its Order entered on February 3, 2009, "Defendant also failed to submit a 'responsive statement of material facts addressing each paragraph of the movant's statement [of facts as to which there is no genuine issue],' as Local Civil Rule 56.1(a) requires." (Docket Item 18 at 1-2 n.1.)  In its February 3, 2009 Order, the Court ordered that "if Defendant intends to oppose any aspect of Plaintiffs' motion for preliminary injunctive relief, [] Defendant [must] file a brief which sets forth its arguments, with appropriate citations to the factual record and to legal authority, as to why the relief sought by Plaintiffs should not be entered."  (Id. at 2.)  Defendant filed no such submission. The Court heard oral argument on Plaintiffs' motion at a hearing convened on February 11, 2009 and reserved decision.[3]

---

[3]  At the February 11, 2009 hearing, defense counsel represented that the Borough intended to repeal the landlord responsibility ordinance and did not object to the entry of an

## III. DISCUSSION

In their motion, Plaintiffs seek (1) to enjoin the Borough from enforcing its property rental ordinances in a manner that infringes upon Plaintiffs' rights under the FHA, and (2) a declaratory determination by the Court that the Borough's ordinance pertaining to the issuance of certificates of occupancy is facially unconstitutional.  The Court addresses these separate aspects of Plaintiffs' motion in turn below.

### A.   Motion for Preliminary Injunctive Relief

Plaintiffs assert a claim for preliminary injunctive relief pursuant to the Fair Housing Act, 42 U.S.C. 3601, et seq., arguing that Defendant has issued bogus citations of Plaintiffs' properties for nonexistent violations of the certificate of occupancy ordinance, and has enacted what Plaintiffs view as an unreasonable and punitive "Ordinance Creating Landlord Responsibilities," (Daily Aff. Ex. A), in an effort to interfere with Plaintiffs' efforts to rent their properties to nonwhite tenants.  Plaintiffs seek a "preliminary injunction restraining the Borough of Magnolia from enforcing any of its housing ordinances against the plaintiffs pending the final disposition of this litigation . . ."  (Proposed Order at 2.)  The following discussion sets forth the standard governing the Court's review

_____

injunction preventing the Borough from enforcing the ordinance against Plaintiffs pending its repeal.

10

of Plaintiffs' motion for preliminary injunctive relief before addressing the merits of Plaintiffs' motion.

       1.   <u>Standard of Review</u>

In order to obtain a preliminary injunction, the moving party must establish that "(1) it has a likelihood of success on the merits, (2) it will suffer irreparable harm if the injunction is denied, (3) granting preliminary relief will not result in even greater harm to the nonmoving party, and (4) the public interest favors such relief." <u>Rogers v. Corbett</u>, 468 F.3d 188, 192 (3d Cir. 2006) (internal quotations and citations omitted). "All four factors should favor preliminary relief before the injunction will issue." <u>S & R Corp. v. Jiffy Lube Intern., Inc.</u>, 968 F.2d 371, 375 (3d Cir. 1992). As the Court of Appeals has recognized:

> The grant of injunctive relief is an extraordinary remedy which should be granted only in limited circumstances. This proposition is particularly apt in motions for preliminary injunctions, when the motion comes before the facts are developed to a full extent through the normal course of discovery.

<u>American Tel. and Tel. Co. v. Winback and Conserve Program, Inc.</u>, 42 F.3d 1421, 1426-27 (3d Cir. 1994) (internal quotations and citations omitted).

       2.   <u>Analysis</u>

         a.   <u>Likelihood of Success</u>

Plaintiffs allege that Defendant issued baseless citations of their properties for nonexistent infractions of the Borough's

certificate of occupancy ordinance, and enacted a punitive ordinance imposing steep fines upon landlords and strict liability for the actions of all persons on the landlord's property, and assert that these actions were taken in order to interfere with Plaintiffs' ability to lease apartments to nonwhite tenants in violation of the FHA.  On this record, with Defendants' minimal opposition to Plaintiffs' motion for preliminary injunctive relief, the Court finds that Plaintiffs are likely to prevail on the merits of their FHA claim, and will grant Plaintiffs' motion for preliminary injunctive relief as described in detail below.

Section 3617 of the FHA makes it "unlawful to . . . interfere with any person . . . on account of his having aided . . . any other person in the exercise or enjoyment of[] any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."[4]  42 U.S.C. § 3617.  Section 3604, in turn, makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race . . ."  § 3604(b).  Putting these two provisions together, the FHA makes it unlawful to interfere with a person's

_____

[4]  It is well-established that the FHA "applies to municipalities, as well as to health, safety, and land use regulations and policies."  San Pedro Hotel Co., Inc. v. City of Los Angeles, 159 F.3d 470, 475 (9th Cir. 1998) (internal quotations and citations omitted).

12

provision of housing to tenants if such interference is based

upon, <u>inter alia</u>, the race of those tenants.[5]

> [I]n order to prevail on a § 3617 claim, the plaintiff
> must show that (1) he is a protected individual under the
> FHA, (2) he was engaged in the exercise or enjoyment of
> [his] fair housing rights, (3) Defendants were motivated
> in part by an intent to discriminate, or their conduct
> produced a disparate impact, and (4) Defendants . . .
> interfered with Plaintiff on account of [his] protected
> activity under the FHA.

<u>East-Miller v. Lake County Highway Dept.</u>, 421 F.3d 558, 563 (7th

Cir. 2005) (internal quotations, citations, and brackets

omitted).[6]  Or, as another court has explained, liability under

_____

   [5]  <u>See</u> <u>Nevels v. Western World Ins. Co., Inc.</u>, 359 F. Supp.
2d 1110, 1122 (W.D. Wash. 2004) (explaining that "§ 3617 does not
require a showing of force or violence for coercion,
interference, intimidation, or threats to give rise to
liability," and that the concept of "interference" has been
"broadly applied to reach all practices which have the effect of
interfering with the exercise of rights under the federal fair
housing laws") (quoting <u>Walker v. City of Lakewood</u>, 272 F.3d
1114, 1128-29 (9th Cir. 2001) (internal quotations omitted).

   [6]  The framework courts employ in evaluating employment
discrimination claims applies to claims brought pursuant to the
FHA.  <u>See</u> <u>Chauhan v. M. Alfieri Co., Inc.</u>, 897 F.2d 123, 127 (3d
Cir. 1990).  "As in employment discrimination cases, a plaintiff
can prove discriminatory animus by direct evidence or by an
indirect or inferential method of proof."  <u>Texas v. Crest Asset
Management, Inc.</u>, 85 F. Supp. 2d 722, 728 (S.D. Tex. 2000).
Where proof of discrimination is inferential or indirect, the
analysis follows the burden-shifting framework set forth in
<u>McDonnell Douglas</u> and its progeny, under which a plaintiff must
establish a prima facie case of discrimination in order to shift
the burden of persuasion to the defendant to articulate a
nondiscriminatory explanation for its conduct; once such an
explanation is offered, the burden shifts back to the plaintiff
to prove that the defendant's explanation is a pretext for
discrimination.  <u>Chauhan</u>, 897 F.2d at 127.
   The burden-shifting framework set forth in "the <u>McDonnell
Douglas</u> test is inapplicable where the plaintiff presents direct

section 3617 "exists if a plaintiff can demonstrate that . . . a defendant . . . interfered . . . with a . . . plaintiff's aid or encouragement to a protected person to exercise or enjoy a housing right . . . because of discriminatory animus." Gourlay v. Forest Lake Estates Civic Ass'n of Port Richey, Inc., 276 F. Supp. 2d 1222, 1235 (M.D. Fla. 2003), vacated on other grounds by 2003 WL 22149660 (M.D. Fla. Sept. 16, 2003).

As to the first consideration – whether Plaintiffs, as landlords who themselves were not discriminated against on account of their race, can claim protection under the FHA – it is well-settled that "claims brought under the [FHA] are to be judged under a very liberal standing requirement" and that

_____

evidence of discrimination." Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985).

> "A plaintiff who can offer sufficient direct evidence of intentional discrimination should prevail, just as in any other civil case where a plaintiff meets his burden." Nichols v. Loral Vought Sys. Corp., 81 F.3d 38, 40 (5th Cir. 1996) . . . "Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact (i.e., unlawful discrimination) without any inferences or presumptions." Bodenheimer v. PPG Indus., Inc., 5 F.3d 955, 958 (5th Cir. 1993) . . . . Once a plaintiff has presented prima facie evidence of housing discrimination, either through direct or circumstantial evidence, summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a discrimination claim is the elusive factual question of intentional discrimination.

Texas, 85 F. Supp. 2d at 729 (some internal quotations and citations omitted).

"[u]nlike actions brought under other provisions of civil rights law, the plaintiff need not allege that he or she was a victim of discrimination." San Pedro Hotel Co., Inc. v. City of Los Angeles, 159 F.3d 470, 475 (9th Cir. 1998).  "Thus the sole requirement for standing to sue under the [FHA] is the Art. III injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered a distinct and palpable injury." Growth Horizons, Inc. v. Delaware County, Pa., 983 F.2d 1277, 1281 (3d Cir. 1993) (quoting Havens Realty Corp. v. Coleman, 455 U.S. 363, 372 (1982), and noting as well that "an aggrieved person does not necessarily have to be the person discriminated against") (internal quotations omitted); cf. Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 212 (1972) (noting that white tenant could sue landlord under FHA for discriminating against black tenants and that "all in the same housing unit who are injured by racial discrimination in the management of those facilities [are] within the coverage of the statute").

Plaintiffs fall within these liberal standards regarding the standing of those who are permitted to invoke the protections of the FHA.  According to Plaintiffs' allegations, Defendant interfered with their ability to lease apartments to nonwhite tenants out of discriminatory animus toward such tenants by issuing illegitimate citations of Plaintiffs' buildings (thereby

15

delaying Plaintiffs' receipt of certificates of occupancy), and by enacting what Plaintiffs allege is an unreasonable and punitive landlord responsibility ordinance.  Plaintiffs, who allege that they sought to "aid[] . . . [such prospective tenants] in the exercise or enjoyment of[] [their] right[s] granted or protected by section . . . 3604 . . . of this title," § 3617, and that the Borough took steps to interfere with Plaintiffs' provision of rental housing to nonwhite tenants, qualify for protection under the FHA.  Cf. San Pedro Hotel Co., 159 F.3d at 475 (noting that a "real estate agent fired for renting apartments to minorities [is] allowed to sue under the Act").

For similar reasons, Plaintiffs' actions in renting apartments to nonwhite tenants constitute aiding "the exercise or enjoyment of . . . fair housing rights" under the FHA. East-Miller, 421 F.3d at 563.  Just as an employer who takes adverse employment action against an employee because of that employee's provision of assistance to minorities "seeking access to the sale or rental of a dwelling" interferes with that employee's fair housing rights, see 24 C.F.R. § 100.400,[7] so too

─────────────

[7] The cited Department of Housing and Urban Development regulation provides as an example of unlawful interference with FHA rights "[t]hreatening an employee or agent with dismissal or an adverse employment action, or taking such adverse employment action, for any effort to assist a person seeking access to the sale or rental of a dwelling or seeking access to any residential real estate-related transaction, because of the race, color,

does a landlord that rents dwellings to tenants on a race-neutral basis "aid[] . . . in the exercise or enjoyment of" fair housing rights.  § 3617.  See Nevels v. Western World Ins. Co., Inc., 359 F. Supp. 2d 1110, 1122 (W.D. Wash. 2004).

The third and fourth prongs of Plaintiffs' FHA interference claim requires them to establish that "Defendants were motivated in part by an intent to discriminate, or their conduct produced a disparate impact," and that the defendant "interfered with Plaintiff on account of [his] protected activity."  East-Miller, 421 F.3d at 563.  In support of their argument that Defendant intentionally sought to interfere with their FHA rights on account of the ethnicity of their tenants, Plaintiffs draw the Court's attention to a remark made by Magnolia Mayor Betty Ann Cowling-Carson at a February 8, 2008 meeting with Magnolia landlords, including a representative of Raab Family Partnership, Inc., to discuss the recently enacted "Ordinance Creating Landlord Responsibilities."  According to Plaintiffs' evidence, at the February 8, 2008 meeting, Mayor Cowling-Carson stated that the Borough's primary concern with regard to rental complexes like Plaintiffs' was that it did not want "the trash from

---

religion, sex, handicap, familial status, or national origin of that person or of any person associated with that person."  24 C.F.R. § 100.400.

Lindenwold moving to Magnolia."[8]   (Plotkin Aff. ¶ 22.)   According
to Plaintiffs, in light of the "well[-]known [demographic]
history" of Lindenwold, (id. at ¶ 30), this statement is direct
evidence that the Borough's motive in enacting the landlord
responsibility ordinance, and in issuing false and deliberately
nonspecific citations of Plaintiffs' buildings shortly after the
Mayor's comments, was based in part on racial animus.

    Although "[m]unicipal officials acting in their official
capacities seldom, if ever, announce on the record that they are
pursuing a particular course of action because of their desire to
discriminate against a racial minority," United States v. City of
Birmingham, Mich., 727 F.2d 560, 564 (6th Cir. 1984) (citation
omitted), Mayor Cowling-Carson's statement supports a finding
that the Borough's intent in enacting the landlord responsibility
ordinance, and in issuing citations to Plaintiffs for nonexistent
certificate of occupancy violations, was "motivated in part by an
intent to discriminate."[9]   East-Miller, 421 F.3d at 563.   While

_____

    [8]  To the extent that this representation of the Mayor's
statement raises hearsay concerns, it bears noting that the Mayor
is an agent of the party-opponent and that at the preliminary
injunction stage, courts "may rely on otherwise inadmissible
evidence, including hearsay." Kos Pharmaceuticals, Inc. v. Andrx
Corp., 369 F.3d 700, 718 (3d Cir. 2004) (citation omitted).   In
any event, the Mayor's statement regarding a matter within her
official responsibilities is not hearsay, Fed. R. Evid. 801(d),
when offered by the opposing party.

    [9]  "According to the United States Federal Census of 2000,
of which [the Court takes] . . . judicial notice," Citizens
Financial Group, Inc. v. Citizens Nat. Bank of Evans City, 383

Mayor Cowling-Carson referred to the "trash" from Lindenwold, rather than referring specifically to the race of the Lindenwold residents she had in mind, as Plaintiff argues, courts have made findings of discrimination based upon similar, thinly veiled statements.  See, e.g., City of Birmingham, Mich., 727 F.2d at 563 ("when the group led by Nancy Elby referred to 'those people,' they were referring to black people").[10]  The Court likewise finds that such a conclusion is warranted here, and finds, for purposes of deciding Plaintiffs' motion for preliminary injunctive relief, that the Mayor's reference to "trash" referred to the sizable nonwhite population of Lindenwold.  See id.; see also Note 9, supra.  In light of this

---

F.3d 110, 127 n.2 (3d Cir. 2004), the population of the Borough of Magnolia is twenty-three percent nonwhite, see United States Census Bureau, http://www.census.gov/ (enter "Magnolia, New Jersey" into data finder), while the population of the Borough of Lindenwold is almost thirty-nine percent nonwhite.  See United States Census Bureau, http://www.census.gov/ (enter "Lindenwold, New Jersey" into data finder).  Moreover, the Court "take[s] judicial notice of newspaper accounts," Peters v. Delaware River Port Authority of Pennsylvania and New Jersey, 16 F.3d 1346, 1356 n.12 (3d Cir. 1994), indicating that the number of Latino immigrants has "risen sharply over the last decade in Lindenwold, where they have been drawn by jobs, easy public transportation, and relatively low rents at 23 garden-style apartment complexes." Edward Colimore, Latinos Fill Area Jobs . . . And Town, Philadelphia Inquirer, June 13, 2002, at A01.

[10]  Cf. Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 268 (1977) (in determining whether invidious discrimination was a motivating factor behind legislation, "[t]he legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports").

uncontested evidence suggesting that the intent behind the
Borough's enactment of the landlord responsibility ordinance was
based at least in part on animus toward landlords who rent
apartments to nonwhite tenants, the Court concludes that a
finding that "Defendants were motivated in part by an intent to
discriminate" is warranted here.[11]   East-Miller, 421 F.3d at 563.

The Court likewise concludes that, in conjunction with the
Mayor's statement, a finding of discrimination is further
warranted from the Borough's issuance of fifty-three municipal

---

[11]   It is worth noting that irrespective of whether the
landlord responsibility ordinance could be lawfully applied to
Plaintiffs if it were not the product of discrimination,

> [i]f a defendant's acts are undertaken with an improper
> discriminatory motive, the Act is violated even though
> those acts may have otherwise been justified under state
> law. Woods-Drake v. Lundy, 667 F.2d 1198, 1202 (5th Cir.
> 1982); United States v. City of Parma, Ohio, 494 F. Supp.
> 1049, 1099 (N.D. Ohio 1980), aff'd, 661 F.2d 562 (6th
> Cir. 1981), cert. denied, 456 U.S. 926 ("Actions which
> are typically lawful . . . lose that character when they
> are undertaken for a discriminatory purpose") (citations
> omitted).   Therefore, although a municipality has a
> legitimate governmental interest in regulating land use,
> we have a duty under the Act to ensure that that interest
> is effectuated in a nondiscriminatory manner.

United States v. Borough of Audubon, N.J., 797 F. Supp. 353, 360
(D.N.J. 1991); see also Green Party of State of New York v.
Weiner, 216 F. Supp. 2d 176, 188 (S.D.N.Y. 2002).   Thus, while
there is authority to suggest that ordinances imposing liability
on landlords for certain conduct of their tenants are not
unconstitutional in the absence of a discriminatory motive, see
Berwick Area Landlord Ass'n v. Borough of Berwick, No. 07-316,
2007 WL 2065247, at *6 (M.D. Pa. July 16, 2007), the presence of
discriminatory intent, as evidenced by the Mayor's comment,
alters the equation.

court citations charging Plaintiffs with having failed to obtain
certificates of occupancy for their properties, and finds that
Plaintiffs are likely to prevail in proving that such baseless
citations interfered with their efforts to lease housing to
nonwhite tenants.  According to Plaintiff's evidence, these
citations were issued within two months of the Mayor's statement
that the Borough did not want "the trash from Lindenwold moving
to Magnolia." (Plotkin Aff. ¶ 22.)  When Plaintiffs informed the
Borough that they indeed possessed certificates of occupancy for
all of the cited properties, and requested that the Borough
reexamine its records, Plaintiffs were informed that the Borough
"didn't have the time to check them and [that] it was basically
[Plaintiffs'] task to disprove the charges." (Id. at ¶ 42.)  As
Plaintiffs indicate through Mr. Plotkin's Affidavit, "over the
course of almost 4 months, which involved numerous municipal
court adjournments, we obtained and submitted to the Borough the
information that proved that in not one instance had we violated
Chapter 112." (Id. at ¶ 45.)  In view of the proximity of these
apparently baseless citations to Mayor Cowling-Carson's February
8, 2008 statement, as well as the apparently overzealous
enforcement evidenced by the issuance of fifty-three groundless
citations, the Court finds that Plaintiffs are likely to succeed
in proving that such over-enforcement was the product of
discriminatory animus based upon the race of Plaintiffs' current

and prospective tenants.  See Fowler v. Borough of Westville, 97
F. Supp. 2d 602, 613 (D.N.J. 2000) (jury could find intentional
discrimination in violation of FHA where zealous enforcement of
ordinances was accompanied by statements suggestive of
discriminatory intent).[12]

For similar reasons, the Court further finds that Plaintiffs
are likely to succeed in proving that Defendant's issuance of
citations to Plaintiffs' properties for alleged maintenance and
building code violations in the months following the Borough Hall
meeting interfered with their provision of rental housing to
nonwhite tenants in violation of the FHA.  See East-Miller, 421
F.3d at 563.  Plaintiffs' evidence demonstrates that, in the wake
of Mayor Cowling-Carson's comment regarding the "trash from
Lindenwold," (Plotkin Aff. ¶ 22), the Borough declined to issue
certificates of occupancy for Plaintiffs' properties on account
of an evolving and nonspecific list of purported maintenance and
building code violations.  The evidence indicates that as
Plaintiffs made the specific improvements to their properties
requested by the Borough, the Borough continued to withhold the
certificates of occupancy for which Plaintiffs applied by

---

[12]  These facts are illustrative of the pretextual nature of
Magnolia's justification for its actions.  Where the Borough's
explanations are so flimsy and incoherent as to be irrational,
the factfinder may infer that discrimination was a motivating
factor in the passage and enforcement of the ordinance against
these plaintiffs.

identifying new aesthetic improvements it desired Plaintiffs to make.  (Raab Aff. Exs. E-G.)  Despite Plaintiffs' repeated requests for "evidence that the complexes are in violation of any code or ordinance," (Raab Aff. Ex. F at 2), and for "a written and detailed list of the maintenance issues the Borough claims to still exist" at the complexes, (Raab Aff. Ex. H at 1), such a list was not provided until July 24, 2008, approximately four months after the first occupancy certificate request was submitted and more than a month after Plaintiffs requested specific details as to the nature of the alleged code violations, (Raab Aff. Exs. I-J); the Borough did not issue the requested certificates until September 2008.  (Raab Aff. ¶ 55.)  The proximity of this protracted failure to inform Plaintiffs of the nature of the alleged code violations to the date of the Mayor's "trash from Lindenwold" comment leads the Court to find that Plaintiffs are likely to succeed in showing that the Borough's interference with Plaintiffs' FHA rights was motivated by the race of Plaintiffs' tenants.  See Fowler, 97 F. Supp. 2d at 613.[13]

-------

[13]  Because Plaintiffs herein have adduced direct (and uncontested) evidence of discriminatory animus in the Mayor's February 8, 2008 statement, Defendants would bear the burden of proof in establishing that their actions were not motivated by discriminatory intent.  See Thurston, 469 U.S. at 121; see also Note 6, supra.  Defendants have failed to meaningfully oppose Plaintiffs' motion for preliminary injunctive relief and have not undermined Plaintiffs' evidence of discriminatory intent.

In summary, based upon Plaintiffs' evidence and Defendant's minimal opposition thereto, the Court finds that Plaintiffs are sufficiently likely to prevail on the merits of their FHA claim to justify the entry of preliminary injunctive relief targeting the application of the Borough's rental apartment ordinances to Plaintiffs' properties.

        b.   <u>Irreparable Harm</u>

To prove that it is entitled to preliminary injunctive relief, a party must likewise demonstrate that "it will suffer irreparable harm if the injunction is denied." <u>Rogers</u>, 468 F.3d at 192.  In support of their motion, Plaintiffs draw the Court's attention to cases holding that "[w]hen a plaintiff who has standing to bring suit shows a substantial likelihood that a defendant has violated specific fair housing statutes and regulations, that alone, if unrebutted, is sufficient to support an injunction remedying those violations." <u>Rogers v. Windmill Pointe Village Club Ass'n, Inc.</u>, 967 F.2d 525, 528 (11th Cir. 1992) (citation omitted) (explaining as well that "irreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes"); <u>see also</u> <u>Assisted Living Associates of Moorestown, L.L.C. v. Moorestown Tp. Board of Adjustment</u>, 996 F. Supp. 409, 439 (D.N.J. 1998) (in the context of a FHA claim, citing numerous cases and holding that "a statutory provision authorizing preliminary injunctive relief

24

upon a showing of probable cause to believe that the statute is being violated may be considered a substitute for a finding of irreparable harm for purposes of a preliminary injunction issued under Rule 65").

In this matter, although Plaintiffs' injuries in the form of lost rent are "compensable by money damages and thus do not constitute irreparable harm as a matter of law," Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 728 (3d Cir. 2004), the alleged discrimination that is the subject of their FHA claim is not so compensable.[14]  See Windmill Pointe, 967 F.2d at 528.  In light of courts' recognition that "[i]rreparable injury is presumed from the fact of discrimination in violation of the Fair Housing Act," Housing Rights Center v. Donald Sterling Corp., 274 F. Supp. 2d 1129, 1140 (C.D. Cal. 2003) (citing cases), considerations of irreparable harm support the issuance of a limited injunction targeting the discriminatory conduct which Plaintiffs are likely to prove on the merits of their FHA claim.

c.   Balance of Hardships and Public Interest

The final considerations under the preliminary injunction standard – whether "granting preliminary relief will not result

---

[14]  As was recognized, supra, "[u]nlike actions brought under other provisions of civil rights law, the plaintiff need not allege that he or she was a victim of discrimination."  San Pedro Hotel Co., 159 F.3d at 475.

in even greater harm to the nonmoving party," and whether "the public interest favors such relief," Rogers, 468 F.3d at 192 – weigh in favor of issuing a narrowly drawn injunction.  While, as a very general matter, "eradicating housing discrimination serves the public interest," United States v. Edward Rose & Sons, 384 F.3d 258, 264 (6th Cir. 2004) (citation omitted), the injunctive relief Plaintiffs seek – immunity from the enforcement of the entirety of Magnolia's housing laws throughout the pendency of this litigation – is extremely broad and risks inflicting disproportionate harm on Defendant and dis-serving the public interest.

Plaintiffs seek a "preliminary injunction restraining the Borough of Magnolia from enforcing any of its housing ordinances against the plaintiffs pending the final disposition of this litigation . . ." (Proposed Order at 2) (emphasis added).  While Plaintiffs have demonstrated a likelihood of proving a limited FHA violation, their evidence does not support a finding that the entirety of Magnolia's housing ordinances have been, and will continue to be, applied to them on a discriminatory basis. Moreover, considerations of public safety and the welfare of Plaintiffs' tenants do not weigh in favor of relieving Plaintiffs from the requirements of Magnolia's housing laws for the duration of this lawsuit.  In summary, the Court finds that the final two considerations for the entry of injunctive relief weigh in favor

26

of granting a preliminary injunction, but one more narrowly circumscribed than the broad relief Plaintiffs have sought here.

     3.   <u>Summary of Findings of Fact and Conclusions of Law, and Terms of Injunction</u>

     Pursuant to Federal Rule of Civil Procedure 65, the Court makes the following findings of fact and conclusions of law in granting Plaintiffs' motion for preliminary injunctive relief.

     1.  The Court concludes that it has jurisdiction over this matter pursuant to 42 U.S.C. § 3613(a), which authorizes "[a]n aggrieved person [to] commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice," and, pursuant to 42 U.S.C. § 3613(c)(1), which authorizes the Court to "grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate)."

     2.  The Court incorporates into these findings of fact the facts reviewed in detail in Section II.A, <u>supra</u>.

     3.  The Court likewise finds that at the February 11, 2009 hearing, the Borough, through its counsel, conceded that it would not object to an injunctive order which: (1) required that any officer or employee of the Borough, when issuing a citation for a

violation of a municipal ordinance to Plaintiffs for the
properties at issue herein, specify with particularity the nature
of the violation and the particular provision of law that has
been violated; and (2) enjoined the Borough from enforcing any
provision of the Ordinance Creating Landlord Responsibilities
(Ordinance 2007:11A) against Plaintiffs; indeed, counsel
represented to the Court, on behalf of the Borough, that the
Borough is no longer enforcing this Ordinance and intends to vote
upon its repeal shortly.

    4.  The Court concludes, for the reasons reviewed in detail
in Section III.A.2, supra, that Plaintiffs are likely to succeed
on the merits of proving that the Borough has violated the FHA;
that there is an appreciable risk of irreparable harm if an
injunction were not to issue; that the balance of hardships tips
in Plaintiffs' favor; and that the public interest weighs in
favor of issuing the limited injunctive relief described herein.

    Accordingly, based upon these findings of fact and
conclusions of law, the Court will enter the accompanying Order
for Preliminary Injunctive relief.  Defendant shall be enjoined
from enforcing any provision of Ordinance 2007:11A against
Plaintiffs pending the repeal of this ordinance.  Furthermore,
the Court orders that, during the pendency of this litigation,
any citations issued by Defendant against Plaintiffs' properties
for violations of the certificate of occupancy ordinance or any

housing-related ordinance must be issued with good cause, and must specify with particularity the nature of the violation at issue and the particular provision of law that has been violated.

**B.   Motion for Partial Summary Judgment**

    1.   <u>Standard of Review</u>

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986)).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Liberty Lobby</u>, 477 U.S. at 250; <u>Brewer v. Quaker State Oil Refining Corp.</u>, 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

Although entitled to the benefit of all justifiable inferences from the evidence, "the nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand

summary judgment by resting on mere allegations or denials in the pleadings; rather, that party must set forth 'specific facts showing that there is a genuine issue for trial,' else summary judgment, 'if appropriate,' will be entered."  United States v. Premises Known as 717 South Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993) (quoting Fed. R. Civ. P. 56(e)) (citations omitted).  As the Supreme Court has explained,

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (internal quotations and citations omitted).

        2.  Analysis

In their motion for partial summary judgment, Plaintiffs seek "a declaratory determination that the Borough's Certificate of Occupancy Ordinance violates due process and is therefore void." (Pls.' Br. at 2-3.)  In support of their motion for a declaratory determination as to the unconstitutionality of the ordinance, Plaintiffs argue, first, that Chapter 112 of the Borough Code is void for vagueness, and, second, that the ordinance contains insufficient mechanisms to protect landlords' due process rights and so is unconstitutional on its face.

30

Section 112-2, which was adopted years before the Landlord
Responsibility Ordinance, reviewed <u>supra</u>, was enacted, provides
in full:

> **Issuance of a certificate of occupancy or a certificate
> of continued occupancy rests with the discretion of the
> Building Inspector or Housing Inspector.  The
> municipality incorporates into this chapter the standards
> established in the BOCA National Property Maintenance
> Code, 1993, Fourth edition.  Determination of whether a
> project meets this code rests with the discretion of the
> Building Inspector or Housing Inspector.**

(Raab Aff. Ex. A at 2.)

According to Plaintiffs, section 112-2 vests unchecked
authority as to whether or not to issue a certificate of
occupancy in Borough officials, and subjects the issuance of such
certificates entirely to these officials' whims.  Further, this
ordinance provides no procedures for the time period within which
the officials must act nor for review of a failure to issue a
certificate of occupancy.  Relying by apparent analogy on First
Amendment jurisprudence holding that "an ordinance which . . .
makes the peaceful enjoyment of freedoms which the Constitution
guarantees contingent upon the uncontrolled will of an official -
as by requiring a permit or license which may be granted or
withheld in the discretion of such official - is an
unconstitutional censorship or prior restraint upon the enjoyment
of those freedoms," <u>Shuttlesworth v. City of Birmingham, Ala.</u>,
394 U.S. 147, 151 (1969), Plaintiffs assert that the discretion
section 112-2 invests in Borough officials renders the entire

31

ordinance vague on its face and requires that the ordinance be declared unconstitutional.  In addition to their void-for-vagueness argument, Plaintiffs argue that section 112-2 is facially unconstitutional because it provides no mechanism whatsoever for an applicant to appeal or otherwise be heard regarding a denial of a certificate of occupancy, and prescribes no timeline for the disposition of such applications.

For the reasons set forth below, the Court is not persuaded by Plaintiffs' argument that section 112-2 is void for vagueness, because it finds that the standards contained in the ordinance are sufficiently clear to survive Plaintiffs' facial challenge.  However, the Court agrees with Plaintiffs that the complete absence from the ordinance of any mechanism for a landowner to be heard with regard to the denial of a certificate of occupancy violates the Due Process Clause and renders the ordinance unconstitutional on its face.[15]

a.  <u>Vagueness</u>

The Court is not persuaded by Plaintiffs' void-for-vagueness argument.  At the outset, it is necessary to clarify the nature

---

[15]  While Plaintiffs assert, in addition to their facial challenges, that the ordinance, as it was applied to them, violated their due process rights, the motion presently under consideration addresses only their facial challenge, and the Court likewise confines the instant analysis to whether the ordinance is unconstitutional on its face.  The Court does not address the question of whether Plaintiffs incurred damages as a result of having been denied due process, a matter to be addressed in subsequent proceedings.

of the relief that Plaintiffs seek in this aspect of their motion.  In seeking a declaration that the Borough's ordinance is void, Plaintiffs assert "[a] 'facial' challenge, . . . [that is,] a claim that the law is invalid in toto - and therefore incapable of any valid application."  Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 n.5 (1982) (internal quotations and citations omitted).  It is widely recognized, however, that "vagueness claims not involving First Amendment freedoms must be examined in light of the facts of the particular case at hand and not as to the statute's facial validity."  Belle Maer Harbor v. Charter Tp. of Harrison, 170 F.3d 553, 557 (6th Cir. 1999); see also United States v. Pungitore, 910 F.2d 1084, 1104 (3d Cir. 1990) ("outside the First Amendment context, a party has standing to raise a vagueness challenge only insofar as the statute is vague as applied to his or her specific conduct").

While there is some authority to suggest that "a party challenging the facial validity of an ordinance on vagueness grounds outside the domain of the First Amendment" may prevail on such a facial challenge by demonstrating that "the enactment is impermissibly vague in all of its applications," Hotel & Motel Ass'n of Oakland v. City of Oakland, 344 F.3d 959, 972 (9th Cir. 2003) (citation omitted), Plaintiffs fall short of clearing the high hurdle established by this standard.  See United States v.

<u>Salerno</u>, 481 U.S. 739, 745 (1987) (to present a successful facial challenge outside of the First Amendment context, a party must "establish that no set of circumstances exists under which the [ordinance] could be valid").  Notwithstanding Plaintiffs' dissatisfaction with the "discretion" section 112-2 invests in "the Building Inspector or Housing Inspector," (Raab Aff. Ex. A at 2), the ordinance at issue herein manifestly is not standardless and is demonstrably not "impermissibly vague in all of its applications."  <u>Hotel & Motel Ass'n</u>, 344 F.3d at 972 (citation omitted).  To the contrary, section 112-2 states that whether or not a certificate of occupancy should issue is determined based upon whether the building in question meets the "standards established in the BOCA National Property Maintenance Code, 1993, Fourth edition."  (Raab Aff. Ex. A at 2.)  The BOCA Code, a document "designed for adoption by state or local governments" for "the protection of public health, safety and welfare," (<u>id.</u> at 1-2), consists almost exclusively of specific prescriptions for occupancy standards, ranging from "light, ventilation and occupancy limitations," to "mechanical and electrical requirements," to "fire safety requirements."  (<u>Id.</u> at 7.)  Plaintiffs' suggestion that the ordinance, which derives its standards from this detailed and highly specific professional code, is "impermissibly vague in all of its applications," is untenable.  <u>Hotel & Motel Ass'n</u>, 344 F.3d at 972 (citation

omitted).

Nor does the fact that the ordinance makes the determination as to whether a particular building conforms to the Code's provisions subject to "the discretion of the Building Inspector or Housing Inspector," (Raab Aff. Ex. A at 2), transform these specific prescriptions into a standardless and impermissibly vague enactment vulnerable to Plaintiffs' vagueness challenge. Plaintiffs' suggestion that the ordinance's use of the word "discretion" alone renders it unconstitutionally vague is not convincing, because "[t]he issuance of a certificate of occupancy necessarily involves the governmental decision making process and requires an[] exercise of discretion." Collins v. Olin Corp., 418 F. Supp. 2d 34, 62 (D. Conn. 2006) (internal quotations and citations omitted). Equally importantly, it is a well-settled principle of statutory construction that "[w]hen the constitutionality of a statute is challenged, it is the court's obligation in determining validity not to destroy but to construe it, if possible, consistently with the will of the legislature, so as to comport with constitutional limitations." Kay v. Austin, 621 F.2d 809, 812 (6th Cir. 1980). That the Building or Housing Inspector must exercise discretion in determining whether a building conforms to the Code's requirements is unsurprising, see Collins, 418 F. Supp. 2d at 62, and the Court declines to presume that the Borough intended for its officers to apply the

Code in an arbitrary or freewheeling fashion by subjecting the issuance of certificates of occupancy to Borough officials' whims.  See Kay, 621 F.2d at 812.  In summary, the Court is not persuaded by Plaintiffs' argument that the ordinance is unconstitutionally vague.

> b.   Procedural Due Process

However, as the Court now explains, it agrees with Plaintiffs, and now finds, that the complete absence from the ordinance of any mechanism by which landlords can appeal a denial of a certificate of occupancy or otherwise be heard means that the ordinance necessarily violates the due process rights of landlords denied occupancy certificates, and that the ordinance is therefore "incapable of any valid application."  Hoffman Estates, 455 U.S. at 495 n.5 (citation omitted).

"The Fourteenth Amendment prohibits a state from 'depriv[ing] any person of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. XIV, § 1."  Elsmere Park Club, L.P. v. Town of Elsmere, 542 F.3d 412, 417 (3d Cir. 2008).  To prevail on a procedural due process claim, Plaintiffs must establish that they "possessed a protected property interest as defined by state law," Norton v. Town of Islip, 239 F. Supp. 2d 264, 269 (E.D.N.Y. 2003) (citation omitted), that this property interest was deprived under color of state law, id., and that "the government process which they must

36

follow is insufficient to properly protect their ownership rights." Jones v. Wildgen, 320 F. Supp. 2d 1116, 1127 (D. Kan. 2004) (citation omitted).

As the Supreme Court has made clear,

the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976). Although this formula suggests that assessing what process is due entails a fact-specific balance of competing interests, "[a] fundamental requirement of due process is the opportunity to be heard." Elsmere Park Club, 542 F.3d at 417 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). Moreover, it is well established that "[t]hat opportunity 'must be granted at a meaningful time and in a meaningful manner.'" Id. (quoting Armstrong, 380 U.S. at 552).

Magnolia's certificate of occupancy ordinance provides no opportunity whatsoever for applicants denied certificates to be heard – that is, it provides no process, irrespective of what precise minimum of process is due – and the Court thus agrees with Plaintiffs that "no set of circumstances exists" under which the ordinance could adequately protect the due process rights of landlords denied certificates. Salerno, 481 U.S. at 745.

37

Initially, as to the threshold question of whether landlords
possess a protected property interest in renting their properties
(and therefore "possessed a protected property interest as
defined by state law" that could not be deprived in the absence
of due process, <u>Norton</u>, 239 F. Supp. 2d at 269), the Court finds
that landlords' "interest in avoiding . . . [the] loss of use of
rental property . . . [is] substantial," <u>Jones</u>, 320 F. Supp. 2d
at 1127, and is protected under New Jersey law.  In a long string
of cases, New Jersey courts have recognized that "the use of
property is one of the essential attributes of ownership," <u>Durkin
Lumber Co. v. Fitzsimmons</u>, 106 N.J.L. 183, 189 (E. & A. 1929),
and that landlords have a protected property interest in rental
income.  See <u>State v. C. I. B. Intern.</u>, 83 N.J. 262, 276 (1980).
Because landlords have such a protected property interest, "the
government cannot deprive [them] of that interest without
[providing] due process."  <u>Seamons v. Snow</u>, 84 F.3d 1226, 1234
(10th Cir. 1996).

        Competing on the <u>Mathews v. Eldridge</u> scale with the
substantial interest of landlords in not being denied rental
income is the government's substantial interest in ensuring that
tenants reside in safe housing conditions.  See <u>Chernin v.
Welchans</u>, 844 F.2d 322, 329 (6th Cir. 1988).  It is well
established that when such competing substantial interests are at
stake,

> [d]epending on the circumstances of the particular case, the hearing called for by the fourteenth amendment may be a pre-deprivation hearing, see, e.g., Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1 (1978), or a pre-deprivation abbreviated "opportunity to respond" with a prompt post-deprivation hearing, e.g. Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985), or solely a prompt post-deprivation hearing. Mathews, 424 U.S. 319. See also Mackey v. Montrym, 443 U.S. 1 (1979).

Id. at 326; see also Elsmere Park Club, 542 F.3d at 417. The Borough, through its certificate of occupancy ordinance, has elected to provide none of these remedies. That is, the ordinance, "neither on its face nor as applied in this case, assured a prompt proceeding and prompt disposition of the outstanding issues between [Plaintiffs and the Borough]." Barry v. Barchi, 443 U.S. 55, 64 (1979). In other words, it provides no "remedies for erroneous deprivations." Zinermon v. Burch, 494 U.S. 113, 126 (1990).

The consequences engendered by the absence of such remedies are borne out in the facts of this case,[16] as Plaintiffs set

---

[16] As the Court explained in Note 15, supra, the claim presently before the Court asserts a facial challenge to the ordinance. The Court does not now determine whether Plaintiffs suffered damages as a result of the constitutional deprivation to which they were allegedly subjected – the Court leaves for another day the determination of whether Plaintiffs were harmed by the ordinance and to what extent. The Court reviews this evidence submitted in support of Plaintiffs' facial challenge in order to satisfy itself that Plaintiffs have standing to assert this facial challenge to the constitutionality of the ordinance. See McConnell v. Federal Election Com'n, 540 U.S. 93, 225-26 (2003) (constitutional minimum of standing requires that a plaintiff demonstrate (1) an injury in fact which is (2) causally connected to the conduct complained of, and (3) likely to be remedied by the relief sought).

forth in their uncontradicted Statement of Undisputed Material Facts.[17]  As the evidence in the record indicates, Plaintiffs submitted applications for certificates of occupancy in March 2008, (Raab Aff. ¶ 31), which the Borough declined to process on account of unspecified code violations.  (Raab Aff. Ex. D.) Throughout the spring and summer of 2008, the Borough continued to deny Plaintiffs' applications, citing evolving aesthetic improvements it desired Plaintiffs to undertake without identifying any ordinance that required that such aesthetic alterations be made, until the Borough elected to issue Plaintiffs' certificates in September 2008, six months after the applications were initially submitted.  (Raab Aff. ¶ 55.) Plaintiffs' experience confirms what the language of the ordinance makes clear – that the ordinance, "neither on its face nor as applied in this case, assured a prompt proceeding and prompt disposition of the outstanding issues between [Plaintiffs and the Borough]," Barry, 443 U.S. at 64, and that the absence of such procedural mechanisms renders the ordinance "incapable" of protecting landlords' due process rights.  Hoffman Estates, 455

---

[17]  The Court noted in Note 1, supra, that Defendant failed to submit a counter-statement of material facts, as Local Civil Rule 56.1 requires.  As the Rule makes clear, "any material fact not disputed [in such a counter-statement] shall be deemed undisputed for purposes of the summary judgment motion."  L. Civ. R. 56.1.  Defendant likewise did not attempt to secure a continuance via Rule 56(f), Fed. R. Civ. P., with an "affidavit that, for specified reasons, it cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(f).

U.S. at 495 n.5 (citation omitted).

Accordingly, for the reasons explained above, the Court is constrained to find that, because Magnolia's certificate of occupancy ordinance permits Borough officials to deny, or to withhold indefinitely, landlords' applications for certificates of occupancy without affording "the opportunity to be heard," Armstrong, 380 U.S. at 552, and with no provisions for the "prompt disposition," Barry, 443 U.S. at 64, or any disposition, of landlords' applications, the ordinance is "incapable of any valid application" that adequately protects the due process rights of applicants for certificates of occupancy. Hoffman Estates, 455 U.S. at 495 n.5 (citation omitted). Although "[t]he due process clause is not a straitjacket, preventing state governments from experimenting with more efficient methods of delivering governmental services," Van Harken v. City of Chicago, 103 F.3d 1346, 1351 (7th Cir. 1997), such experimentation may not permissibly extend to denying outright the "fundamental [due process] requirement" – a private party's "opportunity to be heard." Armstrong, 380 U.S. at 552. The Borough's certificate of occupancy ordinance, as presently written, fails to provide any mechanism whatsoever for landlords to be heard regarding denied or indefinitely withheld certificates of occupancy, and it thus fails to satisfy the requirements of procedural due process. Accordingly, the Court will enter a declaratory judgment that the

Borough's Certificate of Occupancy Ordinance in Section 112-2 is constitutionally void.

**IV.   CONCLUSION**

For the foregoing reasons, the Court will grant Plaintiffs' motion for preliminary injunctive relief and for partial summary judgment.  The accompanying Order for Preliminary Injunctive Relief and for Declaratory Relief will be entered.


**February 13, 2009**                        **s/ Jerome B. Simandle**
Date                                         JEROME B. SIMANDLE
                                             United States District Judge